## In the Matter of Donald F. COESTER, Bankrupt.

## Kenneth A. BERDICK, Plaintiff,

v.

## Donald F. COESTER, Defendant.

Bankruptcy No. 79–1136–BK–WMH–JAG. Adv. No. 2.

United States Bankruptcy Court, S. D. Florida.

June 2, 1981.

David H. Klein, Miami, Fla., for defendant-bankrupt.

Milton E. Grusmark, Miami, Fla., for plaintiff.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This adversary proceeding in a case filed prior to the effective date of the new Bankruptcy Code, came to trial on the first count of the complaint of Kenneth A. Berdick. Plaintiff objects to the discharge of the

bankrupt, Donald F. Coester, because of a mortgage given by the bankrupt to his wife on his interest in a house held by the two as a tenancy by the entirety. Plaintiff contends that defendant thereby intentionally divested himself of his property, in fraud of his creditors. While the complaint does not clearly set forth this transaction as the one upon which plaintiff was proceeding, after numerous pre-trial motions and hearings, the defendant was aware of plaintiff's theory of the case at the time it came to trial, and the plaintiff orally requested that the pleadings be conformed to the proof at trial.

For the reasons given below, the court concludes that defendant will not be denied a discharge.

In 1971, defendant Donald Coester and his wife Eleanore Coester purchased a home in South Miami, Florida, which they held as a tenancy by the entirety. They resided there until 1976 when they moved to a home in Plantation, Florida, also held as a tenancy by the entirety. The South Miami house could not be sold and was rented. Eleanore Coester testified that during a period of at least five years, she "lent" her personal funds to her husband with the intention that he repay her. It was her testimony that in 1971 she contributed over $2,000 to purchase the South Miami house, that in 1976 she paid the nearly $800 moving bill from South Miami to Plantation, that she provided the cash at closing and the $500 attorneys' fee for the Plantation house closing, that she made mortgage payments on the Plantation house, and that she made a loan of $233.90 for family living expenses, also in 1976. Mrs. Coester had documents to support her testimony as to the amount of most of the expenses, although a number of the documents do not show on their face that payment was made by Mrs. Coester.

Coester was the primary stockholder of and had personally guaranteed substantial debts of South Florida Health Care Services, Inc., which had financial difficulties. The Florida State Insurance Commission, in its regulatory capacity, intervened, and on January 11, 1979 a receiver was appointed to rehabilitate the corporation. On January 17, 1979, a note and mortgage were executed, by which Donald Coester gave his wife a second mortgage on his interest in their South Miami house on a loan shown to be $16,324.09 (Plaintiff's Exhibit No. 6). In February or March, 1979, South Florida Health Care Services, Inc. went into liquidation.

On September 25, 1979, Donald Coester filed his voluntary individual petition in bankruptcy. The second mortgage to his wife was scheduled in the amount of $12,000 but was not listed as a transfer during the year immediately preceding the filing of the petition. No rental from the house was scheduled as income, and defendant testified that payments on the first mortgage and for repairs exceeded the rental so that there was no net income.

Mrs. Coester testified she insisted that the loans she made to her husband be repaid because her husband was capable of supporting the family and she expected him to do so, and because she was personal representative of her father's estate and the funds were from her father's estate. There was no documentation or more detailed testimony to indicate that the funds were from the estate itself rather than the funds she received as a beneficiary. She also stated that the Plantation house could not have been purchased without her funds and that she therefore advanced them with the expectation of repayment. She testified that it was contemplated that these loans would be repaid from the proceeds of the South Miami house and that it was intended from the beginning that she would receive a mortgage, but that Mr. Coester procrastinated in getting it done.

There was conflicting testimony as to how the $16,000 mortgage note figure was reached. The testimony of attorney Howard Galbut who prepared the mortgage in question, and whose partner handled the closing of the Plantation house was as follows: The Coesters wanted the mortgage prepared because Mrs. Coester had put her own funds into the Plantation house. How-

ever, the mortgage was not prepared at that time (1976) because Galbut needed accurate figures regarding the rate of interest, the full amount of the Plantation closing and other matters. During 1977 through 1979, he represented Mrs. Coester in several matters. Finally, in December 1978 or 1979, Mr. Coester gave Galbut the necessary figures and told him that the husband and wife had agreed to ten percent as the rate of interest. Galbut then computed interest and prepared the instruments for the Coesters to sign.

The Coesters agreed in their testimony that Mrs. Coester kept what records they had. She testified that she did not keep a running balance of the debt because these were "normal family transactions" but that she kept bills, checks and such. She did not testify as to the rate of interest. Mr. Coester testified that their attorney advised them to use a ten percent interest figure. Defendant's position is that the various loans he received from his wife totaled approximately $12,000 and that the pre-mortgage interest brought the total of the debt to the $16,324.09 shown on the mortgage note.

Given the conflicts and contradictions in testimony and in the documentary evidence, and the totality of the circumstances, the court finds that there was no valid debt of Donald Coester to Eleanore Coester which was secured by the mortgage in question. The court further concludes that the bankrupt intended to make the transfer in order to hinder, delay or defraud his creditors. As the transfer was made within the twelve months immediately preceding the filing of the petition in bankruptcy, the defendant's discharge would be denied under § 14(c)(4) of the Bankruptcy Act, 11 U.S.C. § 32 (1978), except that the property encumbered by the mortgage was not a part of the bankruptcy estate.

The court finds as a fact that the consideration alleged to have been given the bankrupt in return for his giving of the mortgage did not exist. The inconsistencies in testimony of the witnesses together with inferences to be drawn from the circumstances and explanations lead the court to conclude that the "loan" from Eleanore Coster to Donald Coester was in part or in whole a sham, designed to justify the giving of the mortgage. Cf. *Rader v. Lichtenthal*, 306 F.2d 195 (2d Cir. 1962).

Nevertheless, the bankrupt's intentions do not affect his discharge in this case. Under Florida law, property held in a tenancy by the entirety is not subject to execution to satisfy the individual debts of only one of the tenants. *Vaughn v. Mandis*, 53 So.2d 704 (Fla.1951); *France v. Hart*, 170 So.2d 52, 53 (Fla.App.1965). Therefore, tenancy by the entirety property does not pass to the bankruptcy trustee under 11 U.S.C. § 110(a). 4A Collier on Bankruptcy ¶ 70.-17[7] and [8] (14th ed.) As a result, a Florida bankrupt's creditors cannot be injured by any transfer by the debtor of his interest in entireties property, and such an act on his part cannot be the basis of a denial of discharge. Cf. *Albinak v. Kuhn*, 149 F.2d 108 (6th Cir. 1945), applying Michigan law as to a tenancy by the entirety.

Pursuant to B.R. 921(a), a Final Judgment incorporating these Findings and Conclusions is being entered this date.